UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 12-218 (JDB) |
| | : | |
| v. | : | |
| | : | |
| TONIO CALHOUN, | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.[1]  On October 25, 2012, the defendant Tonio Calhoun pled guilty pursuant to a plea agreement to one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2).  For the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of incarceration between 135 and 151 months, to be followed by at least 120 months (10 years) of supervised release, with the condition that the defendant undergo intensive sex offender treatment, as well as additional conditions deemed appropriate by the Court and by U.S. Probation, including conditions relating to computer and internet usage and contact with children.  The defendant should also be ordered to register as a sex offender for a minimum period of 25 years.

**I.    BACKGROUND**

At the time of his plea, the defendant admitted the following facts.  Leading up to April

---

[1]   The government filed separately and under seal the victim impact statements that have been received to date in this case.   The government has not received restitution requests from any notified victims.

1

21, 2012, Metropolitan Police Department Detective Timothy Palchak was acting in an undercover capacity as part of a multi-jurisdictional FBI/MPD Child Exploitation Task Force, operating out of a satellite office in Washington, D.C.  In that capacity, Detective Palchak ("UC"), visited a website where individuals can post and/or read fictional stories about adults engaging in various sexual acts with children.  Individuals may comment on the stories anonymously or with a screen name that attaches to their email address.  Based on the experience of the detective in his undercover capacity, this website is frequented by individuals who have a sexual interest in children.

      At approximately 8:00 p.m. on April 21, 2012, the UC observed an individual using the screen name "blackpedo," later identified as the defendant, post a comment on one of the stories on the child sex story website.  In addition, the UC observed a story posted on the website by the defendant titled "A Day Out With Mommy," about a mother sexually abusing her four-year old daughter and allowing an adult male to sexually abuse her daughter.  At approximately 12:07 a.m. on April 22, 2012, the UC sent an email to the defendant, stating, "Hey, just wanted to say hey, big perv here no limits, see you on [the website] all the time thought I would say hello.  Big ped here…"  On April 30, 2012, the defendant responded to the UC's message and began communicating with the UC by email.

      Between April 30, 2012 and May 22, 2012, the UC and the defendant had sporadic email communication.  During the course of these emails, the defendant told the UC that he is 30 years old and was originally from D.C. but now lives in Florida.  When the UC asked if the defendant was "active with any," meaning sexually active with any children, the defendant replied that he did not "know any" but is "keeping his eyes open for any opportunities."  The UC represented to the

2

defendant that he was sexually active with his 12 year-old daughter.  The defendant asked the UC if he was a "collector," which the UC understood to mean a collector of child pornography.  The UC emailed a telephone number to the defendant, and the defendant sent his telephone number to the UC by text message.

On or about May 29, 2012, the UC received information from a cooperating witness ("C1").  C1 informed the UC that the defendant had sent it videos of child pornography by email within the last month.  On May 29, 2012, C1 communicated with the defendant by telephone and email while C1 was in the presence of law enforcement in the District of Columbia.  During course of these communications, C1 told the defendant that it knew the UC and had previously had sexual contact with the UC's 12 year-old daughter.  In addition, the defendant sent to C1's law enforcement supervised email account the following three videos of child pornography:

(1) A 21 second video (file name !N1)(54).wmv) depicting a prepubescent female child, approximately 3 to 4 years-old, lying naked on a couch with her legs hanging off the edge and spread open.  The child's vaginal area is exposed.  The video then switches to an adult male penetrating the child's vagina with his penis.

(2) An 8 minute and 56 second video (file name !!!NE(98).3gp) depicting a prepubescent female child lying naked on her back and touching her genitalia with her finger, masturbating.  An adult male penetrates the child's vagina with his penis.  The video zooms in and stays focused on the genital area of both.

(3) A 6 minute and 35 second video (file name 10 jährige wird gefict(richtig gut).avi) depicting an adult male taking the underwear off of a prepubescent female child and spreading her legs apart.  The video then switches to an adult male penetrating the child's vagina with his penis.  The video zooms in and focuses on the genital area of both.  The male then ejaculates on the child's vaginal area.

On May 30, 2012, the UC received a text message from the defendant.  Between May 30, 2012, and June 13, 2012, the UC and the defendant exchanged numerous text messages.  During this time, on or about June 8, 2012, the defendant came back to the D.C. area.  The defendant and the UC made plans to meet in person to look and photograph young girls in public.  The defendant

and the UC also planned for the UC to give the defendant's resume to a few friends and try to help fix the defendant's computer.

A sampling of the text messages between the defendant and the UC, including attachments, is described herein.  As set forth in detail below, the defendant sent to the UC, among other things, two images of child pornography.

- At approximately 7:04 p.m. on May 30, 2012, the defendant sent a photograph to the UC of a young girl, approximately age 8 to 10 years old, wearing clothes and sitting in a seductive pose.  At approximately 7:18 p.m. on May 30, 2012, the defendant sent a text message to the UC saying, "Yeah, all bullsit aside I'd fuck her too.  I hope he send more.  I'd b *[sic]*".

- At approximately 3:31 p.m. on June 8, 2012, the defendant sent an image of child pornography to the UC by text message.  The image was of a young girl, approximately 2 years of age, facing the camera with her legs spread apart.  The picture was focused on her vagina.

- At approximately 4:11 p.m. on June 8, 2012, the defendant sent a photograph to the UC of a young girl, approximately age 4 or 5 years old, wearing clothes and holding a bag.  The defendant communicated to the UC that this was a girl he saw at the bus station.

- At approximately 9:00 p.m. on June 9, 2012, the defendant sent a message a text message to the UC saying, "Yeah.  I don't know why in the hell I didn't think of that.  She wasn't attractive but it still would've been worth it.  Older sister was hot too.  Probably like 7 or 8.  I didn't even think to hit on the mom.  Probably just let a good opportunity slip through my fingers".

- At approximately 9:06 p.m. on June 9, 2012, the defendant sent a text message to the UC saying, "Oh and there must have been some sort of kids event downtown this morning.  When I got to metro center on the subway there were hot little bitches everywhere".

- At approximately 9:10 p.m. on June 9, 2012, the defendant sent a text message to the UC saying, "I mean I literally walked off the train and was like…son of a bitch.  You don't know where to look.  They were in every direction.  It was like sensory overload or some shit.  I gotta find out what was going on".

- At approximately 9:13 p.m. on June 9, 2012, the defendant sent a text message to the UC saying, "That sounds good.  In Florida I took walks all the time looking for girls to check out.  It's a hobby of mine".

- At approximately 8:03 p.m. on June 11, 2012, the defendant sent a text message to the UC saying, "Nice.  I love 4 yos.  Almost like a toddler but no more diapers.  They're ready".

- On June 11, 2012, the defendant and the UC exchanged text messages about getting together to go "toddler hunting."   At approximately 8:10 p.m. on June 11, 2012, the defendant sent a text message to the UC saying, "Should be able to.  With the warm weather there should be a lot of little skirts."

- At approximately 3:15 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "LOL I'm trying to ignore this hot little vid someone sent me last night.  I'm afraid if I keep watching it I won't get anything done."   At approximately 3:19 p.m. on June 12, 2012, the defendant responded to the UC's request to describe the video:   "I don't know how old she is because it doesn't show her face but her ankles are tied in the air and she's getting fucked in both holes.  It's about 2 min long."   At approximately 3:22 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "He starts in her pussy then her ass then it shows him in her pussy again."

- At approximately 3:24 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Yeah the ones with sound are great.  I've got one with mom licking her 2 yo pussy".

- At approximately 3:46 on June 12, 2012, the defendant sent a text message to the UC saying, "So I'm kind of new to cp.  I only just started seeing it last year and that's only because of stuff people sent me.   Is it all mostly just 30 second or like 2 minute clips?  I've got a couple that are 10 mind *[sic]* or a little longer but I was expecting 30 min scenes like in adult porn.   I guess it doesn't work that way."

- At approximately 3:50 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "I wonder why they overedit that shit.   If I made one, you'd see everything".

- At approximately 3:53 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Well I guess I shouldn't complain.  At least it's better than nothing."

- At approximately 4:31 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "You may have already seen it. But I've got this one pic of a girl with a dick in her ass she's on top in reverse cowgirl and it looks like she's having an orgasm as she fingers her pussy".   At approximately 4:35 p.m. on June 12, 2012, the defendant continued his description:   "The girl is blonde maybe about 9 or 10 years old."

- At approximately 4:37 p.m. on June 12, 2012, the defendant sent an image of child

5

    pornography to the UC by text message. The image was of a pre-pubescent female, approximately 9 or 10 years old, who is not wearing any clothes and is being anally penetrated by an adult male penis.

- At approximately 4:42 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Yeah. I help but get real jealous every time I see pics like that."

- At approximately 4:46 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "I know. I keep thinking that should be my cock."

- The defendant and the UC exchanged text messages about the UC's fictional 12 year-old daughter and his purported sexual contact with her. At approximately 7:36 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "LOL I know what you mean. 12 is getting kind of up there. We need to find us something really young." At approximately 7:38 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Although I'd settle for a really hot 8 or 9 yo."

- At approximately 8:59 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Had to have a little private time before my mom and her husband got home. Thankfully I had Vicky to help with that." The UC understood "Vicky" to be a reference to particular a series of child pornography videos. At approximately 11:48 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Yeah I just found out about her last year but from what I've learned, I guess she's like a celebrity among like-minded people such as us."

- At approximately 11:54 p.m. on June 12, 2012, the defendant sent a text message to the UC regarding their plans to get together the following day: "Should be good times. I haven't seen any little ones the last couple days, it's driving me crazy".

- At approximately 12:01 a.m. on June 13, 2012, the defendant sent a text message to the UC saying, "Yeah, my phone has a pretty decent camera. I like to get pics whenever I can."

- At approximately 12:07 a.m. on June 13, 2012, the defendant sent a photograph to the UC of a girl wearing clothes and standing with her back to the camera, with the focus on her buttocks and legs. At approximately 12:09 a.m. on June 13, 2012, the defendant told the UC where he got the picture: "Little hottie I saw at the mall in Florida a month ago".

- At approximately 12:11 a.m., the defendant sent a photograph to the UC of a young girl, approximately 5 or 6 years old, wearing clothes.

- At approximately 12:11 a.m. on June 13, 2012, the defendant sent a text message to the UC saying, "I gonna miss that damn mall."

6

- At approximately 12:33 a.m. on June 13, 2012, the defendant sent a text message to the UC saying, "You might catch some at Pentagon city on a Saturday but there's more young professionals and teens who think they're the shit shopping there. Not enough little girls for me."

- At approximately 12:42 a.m. on June 13, 2012, the defendant sent a text message to the UC saying, "Springfield mall used to be a good one too. Especially if you like the little Spanish ones. But I heard they shut that mall down. I don't know. I haven't been in that area in years."

- The defendant and the UC exchanged text messages about the time and place of their meeting on the afternoon of June 13, 2012. At approximately 5:45 p.m. on June 13, 2012, the defendant sent a text message to the UC saying, "Alright. That's okay. It'll give me time to find the place and then take a little walk to look at the little ones."

On June 13, 2012, the defendant arrived at the previously arranged meeting site in Washington, D.C. The defendant approached and greeted the UC. The defendant told the UC that he brought his laptop computer for him to fix. The defendant also stated that he brought his resume for the UC. The UC said that he would drop off the defendant's resume and that he would drop of the defendant's computer off at the UC's place. The UC told him that they could then walk around and "look." The UC and the defendant began walking. The UC asked the defendant if he found "anything good." The defendant stated that he was "following a girl with a pink skirt on, she was about 8 years old, and she looked hot as hell." The UC made a prearranged signal and the defendant was arrested by members of the Child Exploitation Task Force.

Following his arrest, the defendant waived his Miranda rights and agreed to be interviewed by law enforcement. Among other things, the defendant admitted that he emailed child pornography to the UC and other people. The defendant admitted to having child pornography videos on his cellular telephone. The defendant admitted to having a sexual interest in children as young as 2 to 3 years-old, up to 11 or 12 years-old.

The defendant gave consent for law enforcement to search three of his email addresses, his cellular telephone, laptop computer, and a thumb drive.  Upon a preliminary review of the defendant's cellular telephone, law enforcement identified approximately 25 videos of child pornography.  Upon a preliminary review of the defendant's laptop computer, law enforcement identified at least 2 videos of child pornography and at least 2 images of child pornography.  Law enforcement found evidence – names of deleted files, for example – that other videos and/or images of child pornography had been viewed on the defendant's computer.  Upon a preliminary review of the defendant's email accounts, law enforcement identified approximately 59 videos of child pornography and approximately 330 images of child pornography, including the following:

- A 1 minute and 26 second video (file name !2yo + mom+dad..-4_xvid.avi) depicting a prepubescent female child, approximately 2 years-old, lying naked on her back with her legs open exposing her vaginal area.  A naked adult female is shown licking the child's vaginal area.  The video then changes to a naked adult male penetrating the child's vagina with his penis.  The man is on top of the child and his face cannot be seen.

- A 3 minute and 33 second video (file name (1) Kait 4Yo – Sweet Sugar.avi) depicting a prepubescent female child, approximately 4 years-old, lying on her back with her underwear pulled down.  An adult hand, which appears to be male, is seen helping the child spread her vagina open as the camera zooms in and focuses on her vagina for several seconds.  The hand then digitally penetrates the child's vagina.  The video switches to showing the child trying to put an adult male penis into her vagina.  The man penetrates the child's vagina with his penis.  The man penetrates the child's mouth with his penis.  The man then masturbates until he ejaculates on the child's face.

- An image (file name ptweleccptd.jpeg) depicting a prepubescent female child sitting with her legs spread apart.  Two clips are attached to her vaginal area and appear to be connected to a device that would be used to shock her.  There is a caption at the top of the photo that reads, "On her ninth birthday, Master gave her a new toy…."  There is also a caption at the bottom that reads, "Punished Girl (c)."

- An image (file name !FuckBaby!.jpeg) depicting what appears to be an infant female child whose legs are being held apart.  An adult male penis penetrates the vagina of the child.  The image is focused on the genital areas of both.

- An image (file name mar32017.jpeg) depicting a prepubescent female child on her hands and knees on a bed. Her hands are tied to the bed with what appears to be white rope. A purple object is stuck in her vaginal area.

The following are a sampling of the file names of other videos of child pornography on the defendant's email accounts: "-!PTHC Donna Pedo"; "((hussyfan)) – little girl takes off panties, gets vagina su(2)"; "((hussyfan))lada_9yr_fuck_on_bed(2)(2)"; "(pthc frifam lolifuck) 11yo Miranda sucks dads big cock and masturbates (New 2012)"; "(Pthc – Jho – Lolifuck) 8 yo Shanice (1) Man Wanks Over Her Ass – New 2009"; "[Spank] wespank[1].net Real punishment of children – 223 Vid&_65533"; "46.!!! NEW 0602 !!! Privado warrier dad making daughter gag"; "2012 4yo Princess Film 0008 [exclusive trade only]"; and "Pthc 2012 9y footjob-handjob; y n g on webcam".

The following are a sampling of the file names of other images of child pornography on the defendant's email accounts: "! yng niece 008"; "!!!! make it fit daddy"; "03eatcum"; "04YRGIRL"; "04becky09 – I share child porn 2"; and "preteenpussy".

## II.     SENTENCING CALCULATION

### A.     Statutory Maximum Penalties

Distribution of Child Pornography is a charge that carries a maximum sentence of 20 years of imprisonment, with a mandatory minimum of 5 years imprisonment pursuant to 18 U.S.C. § 2252A(b)(1), a fine of not more than $250,000 or twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d), an order of restitution, and an obligation to pay any applicable interest or penalties on fines or restitution not timely made, and a period of supervised release – after any period of incarceration – of not less than 5 years or life pursuant to 18 U.S.C. § 3583(k). The defendant must pay a mandatory special assessment of $100 pursuant to 18 U.S.C. § 3013(a)(2)(A). The defendant must also register as a sex offender for at least 25 years pursuant to

18 U.S.C. § 2250, 42 U.S.C. §§ 16911(2) & 16915(a)(1).

### B. Calculation Under the Guidelines

According to the United States Sentencing Commission, Guidelines Manual, 2011 ed., Section 2G2.2(a)(2), an offense involving child pornography has a base level of 22. See PSR ¶ 56. Under § 2G2.2(b)(2), the material involved a prepubescent minor, under the age of 12, adding 2 levels. See PSR ¶ 57. Under § 2G2.2(b)(3)(F), the offense involved distribution, adding 2 levels. See PSR ¶58. Under § 2G2.2(b)(4), the material portrayed sadistic or masochistic conduct or other depictions of violence, adding 4 levels. See PSR ¶ 59. Under § 2G2.2(b)(6), the offense involved the use of a computer, adding 2 levels. See PSR ¶ 60. Under § 2G2.2(b)(7)(D), the offense involved more than 600 images, adding 5 levels. See PSR ¶ 61.[2] Accordingly, the defendant's adjusted offense level is 37. See PSR ¶ 65. The defendant is entitled to a 2-level reduction for acceptance of responsibility pursuant to S§ 3E1.1(a). See PSR ¶ 67. The government hereby moves for an additional 1-level reduction for acceptance of responsibility pursuant to § 3E1.1(b). See PSR ¶ 68. The defendant's total offense level is 34. See PSR ¶ 69.

As set forth in the PSR, the defendant has numerous criminal convictions, pending cases, and arrests related to traffic offenses. See PSR ¶¶ 71-91. The defendant has a conviction for shoplifting, resulting in one criminal history point. See PSR ¶ 82. In addition, one of the defendant's prior convictions would ordinarily result in the assessment of one point if the U.S.

---

[2] Paragraph 61 of the draft PSR and paragraph 5A of the plea agreement incorrectly stated that there were at least 300 but fewer than 600 images, which would add 4 levels under § 2G2.2(b)(7)(C). However, the number of images attributable to the defendant is at least 600, as correctly stated in paragraph 48 of the draft PSR and in the Statement of Offense. The government noted this correction to the PSR in its Receipt and Acknowledgement. See PSR ¶ 50a.

Probation Office had received court documentation for review, but no such documentation was received.  See PSR ¶ 81.  With one criminal history point, the defendant is in Criminal History Category I.  See PSR ¶ 84.

Based on a total offense level of 34 and a criminal history score of one, the defendant's sentencing range under the Guidelines is 151-188 months.  See PSR ¶ 132.[3]

### III.  GOVERNMENT'S SENTENCING RECOMMENDATION

#### A.  Application of the Federal Guidelines post-*Booker*

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1).  Booker, 125 S. Ct. at 756.

As the Supreme Court has stated, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").  After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  Id.  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment

---

3   The draft PSR calculated the defendant's total offense level to be 33, based on the mistake set forth in note 2, supra.  The defendant's sentencing range for an offense level of 33, with a criminal history score of one, would be 135 to 168 months.

11

for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

      **B.**     **Basis for Government's Recommendation**

The government submits that a sentence of between 135 and 151 months of incarceration is appropriate and warranted in this case.

**Nature and circumstances of the offense:** The defendant's conduct in this case and his sexual interest in children, as expressed to the undercover detective, are deeply troubling. The defendant's possession of child pornography helped maintain an underground market for some of the most offensive and pernicious visual content that exists in our society. By distributing these vile images, the defendant further perpetuated the demand for child pornography. The images and videos possessed and distributed by the defendant include the penile penetration of a female infant, the penile penetration of a female toddler approximately two years of age, and a prepubescent female child with her hands tied to a bed and an object protruding from her vagina. Between his cell phone, laptop, and email accounts, the defendant had approximately 85 videos and 332 images depicting child pornography.

The harm posed by the defendant's actions is clear. As the Supreme Court recognized in the seminal case of New York v. Ferber:

> The use of children as subjects of pornographic materials is very harmful to both
> the children and the society as a whole. It has been found that sexually exploited

> children are unable to develop healthy relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.
>
> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.

458 U.S. 747, 758-60 nn. 9 & 10. The Court continued, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. . . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotion repercussions." Id. at 759 n.10.

As the Fifth Circuit similarly concluded, the crimes of a "'passive' child pornography recipient" are not "somehow attenuated as compared to a person who actually produces or distributes child pornography . . . victimization of a child depicted in pornographic material flows just as directly from the crime of knowingly receiving child pornography as it does from the arguably more culpable offenses of producing or distributing child pornography." United States v. Norris, 159 F.3d 926, 930 (5th Cir. 1998). After all, "the 'victimization' of the children involved does not end when the pornographer's camera is put away. The consumer, or end recipient, of pornographic materials may be considered to be causing the children depicted in those materials to suffer as a result of his actions." Id. at 929.

This horrific and ongoing victimization is evidenced in the Victim Impact Statements submitted to the Court under seal with respect to certain "known victims" of the child pornography possessed by the defendant. The impact of the events that led to the creation of those images ultimately possessed and distributed by the defendant – in short, the raping of children – goes far beyond any conceivable or articulable pain and suffering a child, or any human being, should ever

13

have to experience.

As described by one parent of a child victim, the very real, very extensive and very tragic impact of child pornography production, distribution and collection occurs through what is appropriately identified as an "industry" and a "market" that "consumes and destroys innocent children." As that parent explained in a Victim Impact Statement (Attachment A of the separately filed submission):

> From 2002-2003, my daughter was abused repeatedly to produce images for the purpose of being traded/shared over the internet. Without a market to receive and trade those images, without the encouragement of those who wanted to acquire the images, I truly believe this abuse would not have occurred. All those who trade these images and thereby create the demand for lurid and violent depictions of children are participants in the exploitation of my daughter. Each traded picture that placed a value on inventiveness, novelty, or cruelty played a role in egging on the abuser to even more vile acts. The pictures of my daughter were 'made for trade' - her abuser adapted to serve his market – whatever his audience was looking to acquire, that's what happened to her. Torture, degradation, pain & suffering – whatever was being traded for and downloaded directly influenced what happened to her – and what is still happening to other children like her. My daughter was exploited, not by an individual, but also by an industry that consumes and destroys innocent children. Producer, distributor, and consumer – everyone who participates in this evil exchange helps create a market, casting a vote for the next abuse. Regardless or whether they directly abused children themselves, reveled in the images of suffering, or persuaded others to abuse children on their behalf (to provide images of the abuse) each participant has a responsibility for the effects.

Similarly, one child victim (now a grown adult) described in a Victim Impact Statement (Attachment B of the separately filed submission):

> They are trading around my trauma like treats at a party and it feels like I am being raped all over again by every one of them. It sickens me to the core, terrifies me and makes me want to cry. So many nights I have cried myself to sleep thinking of a stranger somewhere staring at their computer with images of a naked me on the screen. I have nightmares about it often. I can never feel safe so long as my images are out there; every time they are downloaded I am exploited again, my privacy is breached, and I feel in danger again. I fear that any of them may try to find me and do something to me.

The defendant's criminal actions in this case, although distinct from the actual sexual abuse of the victims itself, nevertheless remains a continuing victimization of these individuals.

The defendant not only distributed child pornography to the undercover detective and others, but also met with the undercover detective for the purpose of looking at children in public. The defendant described going to malls to look at little girls, and even sent the undercover detective pictures that he had surreptitiously taken of children. The defendant's disturbing "hobby," as he called it, demonstrates the defendant desire and willingness to look beyond the child pornography that he possessed and distributed to attempt to satisfy his prurient and perverted interest in children.

The defendant's admitted conduct that gave rise to the charge in this case is of enormous concern and presents a significant danger to the community.

**History and characteristics of the defendant:** The defendant is a 31 year-old man with minimal criminal history, previous service in the United States Army, and a stable upbringing. The PSR notes that the defendant's sexual interest in children began when he was approximately 14 or 15 years old, although the defendant claims never to have been sexually active with any children as an adult. See PSR ¶ 98. The defendant lived at a childcare provider's residence during the week from infancy to the age of nine or ten and, during that period, he and the other children would touch each other's genitals. See PSR ¶98.

**Punishment, deterrence, protection, and correction:** As described in detail above, the offense at issue in this case is extremely serious and the sentence imposed should reflect that fact. The defendant's distribution of child pornography – to the undercover detective, as well as to other individuals – and his sexual interest in children are of enormous concern and pose an identifiable and significant danger to the community. The defendant's actions in this regard are egregious and

justice requires that they be appropriately punished.   The recommended sentence of incarceration would provide that punishment and also deter future criminal conduct.   Additionally, incarceration would protect the community by incapacitating the defendant.   Correctional treatment would be available to the defendant through the U.S. Bureau of Prisons.

**Available sentences:**   The government submits that incarceration is the most appropriate sentence available for the defendant because it will incapacitate him for a definitive period of time. A lengthy term of supervised release of not less than ten years, with the conditions recommended in the PSR, include registration as a sex offender, would also be appropriate to ensure that the defendant is monitored and the community is protected.   The defendant is still a relatively young man, at the current age of 31, who will need close and extensive monitoring whenever he is released from prison.

To his credit, the defendant noted a willingness to accept responsibility at an early stage of the proceedings, agreeing to continue the preliminary and detention hearings on multiple occasions so that counsel for the parties could discuss resolving the matter short of trial through a plea disposition.   The defendant thereafter entered a preindictment guilty plea on October 25, 2012, a disposition that allowed the defendant to demonstrate his acceptance of responsibility. The defendant's entry of a guilty plea further afforded the government and the Court the benefit of preserving resources.

For all of the reasons set forth above, the government respectfully requests that the Court impose a sentence of incarceration of between 135 and 151 months, to be followed by a term of supervised release of 10 years, with the condition that the defendant undergo intensive sex offender treatment, as well as additional conditions deemed appropriate by the Court and U.S. Probation, including conditions relating to computer and internet usage and contact with children.

The defendant is also required to register as a sex offender for a minimum period of 25 years. This sentence strikes an appropriate balance between the seriousness of the offense, the real and significant danger posed to the community, the need for just punishment, deterrence of criminal conduct, and protection of the community, with the history and characteristics of the defendant.

## IV. CONCLUSION

Wherefore, the government respectfully submits that a sentence of 135-151 months of incarceration be imposed, with a period of supervised release of 120 months, including the conditions recommended in the Presentence Investigation Report.

    Respectfully submitted,

    RONALD C. MACHEN JR.
    UNITED STATES ATTORNEY

    _____
    Cassidy Kesler Pinegar
    Assistant United States Attorney
    D.C. Bar 490163
    555 4th Street, N.W.
    Washington, D.C. 20530
    (202) 252-7765
    Cassidy.Pinegar@usdoj.gov